IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 23, 2004 Session

## DUKE BOWERS CLEMENT v. JANET LEIGH TRAYLOR CLEMENT

**A Direct Appeal from the Circuit Court for Shelby County**
**No. CT-000776-01      The Honorable George H. Brown, Judge**

————————————

**No. W2003-02388-COA-R3-CV - Filed December 30, 2004**

————————————

In an appeal from a final decree of divorce, Wife challenges trial court's classification, valuation, and distribution of marital property, and husband challenges trial court's award of alimony to wife. Wife contends that the trial court erred in several respects: in its classification and valuation of the parties' marital residence; in failing to find that the appreciation of Husband's separate property should be included in the marital estate; in its valuation of the automobile primarily driven by her; in failing to distribute certain marital assets and liabilities; and in failing to award her alimony *in solido* from husband's separate estate. Husband contends that the court erred in awarding wife rehabilitative alimony for a period of seven years. Finding that the trial court erred in classifying and distributing the marital property, we correct the judgment of the trial court and make an equitable division of property.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part,**
**Modified in Part and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

David Caywood and Marc E. Reisman of Memphis for Appellant, Janet Leigh Traylor Clement

Joe M. Duncan of Memphis and Elton A. Rieves, III of West Memphis, Arkansas for Appellee, Duke Bowers Clement

### OPINION

This is an appeal from a final decree of divorce. Janet Leigh Traylor Clement ("Ms. Clement") challenges the trial court's judgment on numerous grounds relating to the valuation, classification, and distribution of marital property. Duke Bowers Clement ("Mr. Clement") contends that the trial court erred in awarding alimony to wife for a seven-year period.

# I. PROCEDURAL HISTORY

On February 8, 2001, Mr. Clement filed his Complaint for Divorce alleging irreconcilable differences. On March 26, 2001, Ms. Clement filed an Answer and Counter-Complaint for Divorce alleging irreconcilable differences and inappropriate marital conduct. On June 16, 2001, Mr. Clement amended his complaint to also allege the ground of inappropriate marital conduct. The divorce trial took place on January 6, 7, 8 and 9, 2003. An Order on Permanent Parenting Plan was entered by agreement on March 11, 2003. The trial court entered a final decree of divorce on September 2, 2003, and the Court amended its final decree on December 1, 2003 (*nunc pro tunc* as of September 2, 2003). Ms. Clement filed a notice of appeal on September 24, 2003. Mr. Clement filed a notice of appeal on October 1, 2003.

# II. FACTS

Janet Leigh Traylor Clement and Duke Bowers Clement met while they were attending college at the University of Tennessee at Knoxville. Both parties earned college degrees. They were married on April 4, 1981, and their son, Bowers, was born on September 30, 1987. In 1996, they began building a large, well-appointed home on an estate-sized lot in the River Oaks neighborhood of Memphis, and they moved into this house in 1997.

At the time of their wedding, Ms. Clement worked in Nashville as a marketing representative for Thomas J. Lipton, Inc., marketing products such as Lipton Tea and Wishbone salad dressings to grocery stores. She continued working at Lipton after she and Mr. Clement were married and moved to Memphis. She earned approximately $24,000 per year while employed by Lipton. Approximately two years into their marriage, Ms. Clement left Lipton and went to work for George Garner Travel Agency as an assistant manager in the leisure department, and she continued working at George Garner Travel until she became pregnant with Bowers. After Bowers was born, Ms. Clement became a full-time homemaker. It was undisputed at trial that Mr. Clement did not want his wife to work outside the home. Around 2000, toward the end of her marriage to Mr. Clement, Ms. Clement returned to work at George Garner on a part-time basis, earning approximately $1,065 per month and receiving no retirement or health benefits.

Mr. Clement, at the time of his wedding to Ms. Clement, worked for Clement Lumber and Realty Co., a family business located in West Memphis, Arkansas, where he was involved in construction and real estate sales. When Clement Lumber and Realty was dissolved, Mr. Clement went to work for another of his family's businesses, Guaranty Loan and Real Estate ("Guaranty"), also located in West Memphis, where he worked at the time of trial. At Guaranty, Mr. Clement was primarily involved in construction, and headed the construction division of the company, one of five divisions. At the time of trial, Mr. Clement's gross annual income was $645,471.

Because Ms. Clement's contribution as a homemaker, and the appropriateness of alimony, are both at issue in this case, we must review the evidence brought forth at trial concerning the respective roles of Mr. and Ms. Clement in the marriage and the degree of fault that they may have borne for the dissolution of the marriage. The parties were not altogether in accord in their

descriptions of the quality of the marriage prior to its unraveling. They had marital difficulties in the early eighties that necessitated marriage counseling. Ms. Clement described Mr. Clement as largely absent from the home even during his free time, due to his golfing, duck hunting, fishing, trips to see football and baseball games, trips to hunt big game in the West, and ski trips. On a normal weekend, Ms. Clement testified, Mr. Clement would leave for the golf course in the morning and would not return until 6 or 6:30 p.m. on both Saturday and Sunday. During hunting season, Mr. Clement would, according to Ms. Clement's testimony, hunt on most weekends, and on weekdays he would go to bed very early at night so he could rise early to hunt the next morning. He enjoyed taking half-week trips to ski or see sports games. Ms. Clement also testified to a number of occasions on which Mr. Clement drank to excess and engaged in raucous and embarrassing behavior in public, such as brawling in a Knoxville bar, dumping out a box of ribbons from Mothers Against Drunk Driving in the parking lot of a football stadium, lifting up women's dresses on dance floors "lots of times," stealing candlesticks from the Mansion at Turtle Creek restaurant in Dallas in the presence of their son,[1] and passing out in a restaurant so that his face landed in his food. Mr. Clement's drunken shenanigans resulted in his ejection from various establishments and caused their son, Bowers, to ask Ms. Clement about Mr. Clement's drinking. Mr. Clement was also present at a 1991 meeting of the executive committee of the Osiris organization of the Memphis Cotton Carnival, held at Memphis Country Club, when two topless women were brought in to help entertain the attendees. Ms. Clement called Joyce Jones, a longtime employee of Memphis Country Club who was working at the Osiris event, to testify that Mr. Clement was among the men who lined up for private sessions with the women, and that he emerged from his session with a "very satisfied expression on his face."

Ms. Clement contended that she bore the lion's share of responsibility for the upkeep of their home and the parenting of their son, who suffered from medical problems when he was a baby and was diagnosed with a learning disability while in school. At trial it was undisputed that Mr. Clement remained at work during the dilation and curettage procedures performed on Ms. Clement after each of her two miscarriages prior to the birth of their son Bowers. Bowers had four surgeries during his early childhood, and it was undisputed that Mr. Clement was present for only one of the four procedures, and that on the sole occasion when he was present, Mr. Clement departed on a three-and-a-half-week African safari just hours after Bowers emerged from surgery. Ms. Clement also testified that she arranged for Bowers' education, arranged his after-school activities, drove him to his games, organized his birthday parties, and bought his Christmas presents. She testified that she served as a room mother, president of the parents' board, and did fundraising for Presbyterian Day School, where Bowers was enrolled as a student. She testified that she always attended the parent-teacher conferences at Bowers' schools, and that Mr. Clement did not attend any of them. She arranged for Bowers to receive help for a learning disability at SpeechCare and Fournier Learning Center. Ms. Clement did concede that Mr. Clement attended a meeting with Dr. Yvonne Fournier when they were arranging for Bowers to be tested at Fournier Learning Center.

---

[1] Mr. Clement testified that he did not, in fact, attempt to steal the candlesticks, but that the husband of the couple dining with them that evening placed the candlesticks in Mr. Clement's jacket pocket without his knowledge. According to Ms. Clement's testimony, when confronted by her protestations that "[t]his is just uncalled for ... This is their property. We have children here," Mr. Clement left the candlesticks on a ledge outside the establishment.

According to Mr. Clement's testimony, he often took Bowers golfing and on hunting, fishing, and sports trips, and he helped coach Bowers' sports teams until Bowers began playing school sports. Mr. Clement alleged that Ms. Clement occasionally drank to excess, and as an example, testified that Ms. Clement once drove the wrong way down a one-way section of Poplar Avenue after leaving the Cockeyed Camel bar and restaurant in Memphis. Mr. Clement testified that the Clements' marriage was a happy one until 1998 when he discovered that Ms. Clement was involved in a relationship with a man she met in Florida on a women's tennis trip. The relationship, conducted largely through sexually-oriented emails, occurred while Mr. and Ms. Clement were undergoing marriage counseling. Ms. Clement had another affair, with a college football coach who lived elsewhere in Tennessee, that she admitted during her deposition in the divorce. With the assistance of a private detective, Mr. Clement learned of an affair Ms. Clement was having with a prominent Memphis businessman. Mr. Clement's discovery of this affair led to a confrontation between himself and Ms. Clement in the master bedroom of their home in January of 2001. Approximately a month later, on February 8, 2001, Mr. Clement filed for divorce.

There was also much testimony adduced at trial concerning the values of the various properties at issue in this case, including the marital home and the various separate properties owned by Mr. Clement. The value of the marital home was contested since Mr. Clement contended that the lot on which the house sat was his separate property, as it was received as a gift from his father prior to Mr. Clement's marriage to Ms. Clement. The appreciation of Mr. Clement's separate property during the marriage was also a vigorously contested issue at trial, since Ms. Clement alleges that her contributions to its appreciation and preservation were substantial and should render such appreciation a marital asset.

The trial court did not include any findings of fact in its final decree of divorce. The court based its distribution of marital assets on the figures presented by Mr. Clement in his Rule 14(c) affidavit. However, the trial court did not mention the appreciation of Mr. Clement's separate assets in its decree. Nor did the trial court mention the issue of the marital home's value or the question of whether the lot should be classified as separate or marital property. The trial court did not mention the valuable pieces of personal property held by the parties or the substantial marital liabilities that were listed on one or both of the parties' 14(c) affidavits. Because this appeal is focused on classification, valuation and distribution of property in this divorce, we will address the trial proof on these various issues in the Analysis section of this opinion, *infra*.

### III. ISSUES

Appellant, Ms. Clement, presents the following issues for review:

1.      "Based upon all of the evidence presented at trial, should Ms. Clement receive a greater-than-equal share of the marital estate?"

2. "Did the manner in which the Trial Court valued (or failed to value) and classified (or failed to classify) the parties' marital residence result in an inequitable distribution of marital property?"

3. "Did the Trial Court err in (A) failing to make a finding as to whether the appreciation in Mr. Clement's separate property was marital or separate; and (B) failing to find that the appreciation of Mr. Clement's separate property should be included in the parties' marital estate and equitably distributed with the parties' other marital assets?"

4. "Did the Trial Court err in failing to distribute various valuable marital assets and substantial liabilities resulting in an inequitable distribution of marital property?"

5. "Did the Trial Court err in valuing the automobile Ms. Clement primarily drove?"

6. "Should Ms. Clement be awarded alimony in solido from Mr. Clement's separate estate (which Mr. Clement values in excess of $5.3 Million) where the parties were married for 22 years; where Ms. Clement fulfilled her role in every respect as a wage-earner, home-maker, and parent; where Mr. Clement earned approximately $645,400 per year; and where Mr. Clement has an enormous separate estate (Ms. Clement only raises this issue as an alternative argument in the event this Court finds, after reviewing the entire record, that the parties' actual marital estate is insufficient to arrive at a just result?)"

Appellee, Mr. Clement, presents one issue for review:

7. Did the Trial Court err in awarding Mrs. Clement rehabilitative alimony in the amount of $4000.00 per month for seven years?

## IV. STANDARD OF REVIEW

Our standard of review in this non-jury case is *de novo* upon the record of the proceedings below and there is no presumption of correctness with respect to the trial court's conclusions of law. *Campbell v. Florida Steel Corp*., **919 S.W.2d 26 (Tenn.1996)** and Tenn. R.App. P. 13(d). The trial court's factual findings are, however, presumed to be correct and we must affirm such findings absent evidence preponderating to the contrary. *Union Carbide Corp. v. Huddleston*, **854 S.W.2d 87 (Tenn.1993)**.

Because the trial judge is in a better position to weigh and evaluate the credibility of the witnesses who testify orally, the weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *In re Estate of Walton v. Young*, **950 S.W.2d 956, 959 (Tenn.1997)**. In reviewing documentary proof such as deposition testimony, "all impressions of weight and credibility are drawn from the contents of the evidence, and not from the appearance of witnesses

and oral testimony at trial." ***Wells v. Tennessee Board of Regents*, 9 S.W.3d 779, 783-784 (Tenn. 1999)**.

## V. ANALYSIS

As we will explain below, we have determined that the trial court erred in its classification, valuation, and distribution of the marital property in this divorce. We conclude that Ms. Clement should receive a greater share of the marital estate than was awarded to her by the trial court, and that the marital estate must include the appreciation of several of Mr. Clement's separate properties. We have also determined that the trial court erred in failing to consider the personal property held by the parties as part of the marital estate, and that it erred in its valuation of the car driven by Ms. Clement. We further conclude that the trial court was correct in awarding Ms. Clement rehabilitative alimony for seven years, but that the court erred in providing that such alimony would end upon the death of Mr. Clement.

**1. "Based upon all of the evidence presented at trial, should Ms. Clement receive a greater-than-equal share of the marital estate?"**

Ms. Clement's first issue on appeal is whether she should have received a greater-than-equal share of the marital estate. She contends that, in view of the unique facts of this case—including the twenty-two-year duration of their marriage, Mr. Clement's greater vocational skills and employability, his superior likelihood of acquiring more capital assets and income in the future, and his sizable separate estate—an equitable division would give Ms. Clement a greater-than-equal share of the marital estate.

The statute governing the equitable division of marital property reads, in relevant part, as follows:

> In making equitable division of marital property, the court shall consider all relevant factors including:
>
> (1) The duration of the marriage;
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, earning capacity, estate, financial liabilities and financial needs of the parties;
> (4) The relative ability of each party for future acquisitions of capital assets and income;
> (5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner, or parent, with the contribution of a party as homemaker or wager earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the spouses.

T.C.A. § 36-4-121 (c). It is necessary for us to consider these factors here. We note that the duration of the marriage, twenty-two years, is a comparatively lengthy marriage. However, both of the parties are still young enough to have some years, perhaps decades, of employment ahead of them. There is a dramatic disparity in the respective vocational skills, employability, and earning capacity of Mr. and Ms. Clement---Mr. Clement's yearly salary was approximately thirty-two times Ms. Clement's yearly salary at the time of trial. It was undisputed that, once their son Bowers was born, Mr. Clement desired that Ms. Clement not work outside the home, and that she spent approximately thirteen years as a full-time homemaker. Mr. Clement was the primary breadwinner of the family for the duration of the marriage, and it is fair to say that Ms. Clement's primary responsibility for the home and for parenting Bowers freed Mr. Clement up to pursue his business interests. From the evidence adduced at trial, Ms. Clement does not have comparable likelihood of obtaining capital assets and income in the future, due at least partly to her thirteen years working in the home. The application of the next factor, set out in T.C.A. § 36-4-121 (c) (5), is a key issue in this case:

> The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role ....

From our review of the evidence, it is indisputable that Ms. Clement, in her role as homemaker and parent, played an important role in the acquisition, preservation, and appreciation of the marital property, and the preservation and appreciation of some of the separate property at issue in this case. Indeed, from the largely undisputed accounts of Mr. Clement's work commitments, his frequent recreational trips, his absences during medical procedures, his lack of involvement in his son's education, and his fondness for alcohol during the marriage, it appears that Ms. Clement bore even more responsibility for the maintenance of the home and the parenting of their son than is typical in such arrangements where one spouse is the breadwinner and the other is the homemaker. Ms. Clement's stable presence in the home made it possible for Mr. Clement to pursue his business interests and consequently made the acquisition, preservation, and appreciation of marital and separate property possible. We will discuss this issue in more detail, in our discussion of Issue 3, *infra*.

As to the next factor, the value of the separate property of each party, Mr. Clement's separate property is worth in the millions of dollars, and Ms. Clement's separate property is comparatively minimal. While substantial at the time of their wedding, Mr. Clement's separate property increased significantly during his marriage to Ms. Clement, due to gifts and inheritance. The record contains nothing to suggest that Ms. Clement had a substantial estate at the time of their wedding.

As to the economic circumstances of the parties at the time the division of property is to become effective, Mr. Clement's separate estate will be substantial, as will his income from his job, which is in the mid-to-high six figures. In contrast, Ms. Clement's economic circumstances will be straitened---with yearly earnings of approximately $20,000 and over a decade spent outside of the paid workforce, Ms. Clement's earnings will be comparatively limited. The fact that Ms. Clement earned a higher salary in the early eighties than she did when returning to work in 2000 when the marriage was dissolving, even ignoring the effects of inflation in the intervening years, is illustrative of her sharply diminished earning capacity.

We conclude that it is not appropriate to divide the marital estate in a mechanical fashion; an equitable distribution of marital property need not be a precisely equal distribution of marital property. Having reviewed the record in depth and the statutory factors applicable to this case, we conclude that Mr. Clement did receive a disproportionate share of the marital estate, and that Ms. Clement should receive a greater share of the marital estate than she was awarded by the trial court. Excluding the appreciation of Mr. Clement's separate property (which is dealt with separately, *infra*), and excluding the marital liabilities incurred for the purchase of the Riverwalk Drive home, we believe that Ms. Clement should receive an equal share of the marital property dealt with in this appeal, including the marital residence, the personal property retained by Mr. and Ms. Clement, the wine collection, and the BMW automobile. We leave undisturbed the trial court's distribution of various bank accounts, annuities, insurance policies, and investments. In light of the factors discussed above, especially Ms. Clement's diminished earning capacity due to having worked as a full-time homemaker for thirteen years, as well as Mr. Clement's sizable separate estate, and Ms. Clement's substantial contributions to their household as a homemaker and parent, we conclude that such a distribution will be equitable. In making this distribution, this Court recognizes that Ms. Clement, under these circumstances, has a considerably lesser chance of acquiring assets in the future than does Mr. Clement, given her lack of separate property and diminished earning capacity, compared with Mr. Clement's large separate estate and significant yearly income. Ms. Clement's work as a homemaker played a significant role, we conclude, in allowing Mr. Clement to manage the properties and foster the business interests that compensate him so well. Granting Ms. Clement a greater share of the marital estate than was awarded by the trial court is therefore equitable.

**2. "Did the manner in which the Trial Court valued (or failed to value) and classified (or failed to classify) the parties' marital residence result in an inequitable distribution of marital property?"**

*(a) Classification of the marital residence*

Ms. Clement's second issue on appeal is whether the trial court erred in the way it classified and valued the Clements' marital residence. Ms. Clement contends that both the lot on which the house rests and the house itself should have been classified as marital property; Mr. Clement contends that the lot is his separate property, and that only the house, the bushes, the trees, the fence, and the swimming pool should be classified as marital property. Ms. Clement further contends that the court erred in valuing the marital residence. The court did not explicitly address, in its final decree of divorce, the contested issue of the classification and valuation of the lot and the house. By fully adopting the figures put forth by Mr. Clement in his 14(c) affidavit, the court seemed to have implicitly adopted his argument concerning the classification and valuation of the house and lot. But in the absence of fact-finding we will evaluate the trial proof on this issue *de novo*.

We will first consider the issue of the classification of the lot. Proof at trial showed that the lot was given to Mr. Clement by his father about a month before Mr. and Mrs. Clement were wed. The lot was titled in Mr. Clement's name. For these reasons, Mr. Clement contends that the lot is separate property. Ms. Clement testified that Mr. Clement told her that they were paying his father back for the lot, on a year-to-year basis, although no cancelled checks or other documents were introduced at trial to show that the Clements had, in fact, ever paid the elder Mr. Clement anything for the lot.

We believe that, even if the lot were originally Mr. Clement's separate property, the lot and the home, taken together, constituted marital property at the time of trial. The evidence preponderates in favor of a finding that Mr. Clement and Ms. Clement treated the lot as "their" lot and that Ms. Clement expended considerable effort helping to clear the lot, landscape it, and maintain the yard throughout the years they lived in the spacious house they built there. Although the lot was given to Mr. Clement approximately a month before his wedding to Ms. Clement, the record suggests that the lot was never intended by Mr. Clement to be used for anything other than a marital residence. Under these circumstances, we deem the lot to have been a gift by Mr. Clement to the marital estate. Furthermore, we conclude upon review of the record that even if the lot were not intended as a gift by Mr. Clement to the marital estate, that the way he and Ms. Clement treated the lot resulted in the transmutation of the lot from separate into marital property. Transmutation

> occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses. The rationale underlying both these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

***Batson v. Batson***, **769 S.W.2d 849, 858 (Tenn. Ct. App. 1989)**. The evidence preponderates in favor of a finding that the lot was treated as marital property, that Ms. Clement helped substantially to clear, landscape, and maintain the lot, and that it was not treated as Mr. Clement's separate property during the marriage. Furthermore, we note that in 1997, to obtain a loan for funds spent to develop the lot, *both* Ms. Clement and Mr. Clement signed a note for the benefit of Guaranty Loan, and a deed of trust to secure that note, for which the underlying property was the River Tide Cove lot, with the implication that they were both owners of the lot. Under these circumstances, we conclude that the lot would have been transmuted to marital property even if Mr. Clement had not made it a gift to the marital estate, which we conclude he did.

### (b) Valuation of the marital residence

We now turn to the question of the valuation of the marital home. Both parties had appraisals performed by licensed and certified appraisers, and the reports of both of these appraisers were introduced at trial. Ms. Clement called her appraiser, Ray Hoover, as an expert witness at trial. Mr. Clement did not call any expert witnesses at trial to testify as to the value of the marital home, but Mr. and Ms. Clement's counsel stipulated that Mr. Clement's appraiser, Benny Tyson, would have testified to the correctness of the values contained in his appraisal report .

The trial court did not explicitly state which appraisal it found to be correct. However, in making the distribution of marital property, the trial court relied upon the values that were provided by Mr. Clement. Therefore, it is presumable that the trial court relied upon the appraisal offered by Mr. Clement's appraiser, Benny Tyson. Using a sales comparison approach, Mr. Tyson estimated the value of the property including both the lot and improvements to the lot, to be $1,450,000. Using a cost approach, Mr. Tyson estimated the value of the lot to be $425,000, and estimated the value of improvements to the lot at $1,018,635. Minus the depreciated value of site improvements, and plus the as-is value of site improvements, Mr. Tyson estimated the value of the lot plus the house to be $1,453,076.

Ms. Clement's appraiser, Ray Hoover, arrived at significantly different figures. Using a sales comparison approach, Mr. Hoover estimated the value of the home and lot at $2,350,000. Using a cost approach, Mr. Hoover estimated the site value at $1,000,000, and estimated the value of improvements to the lot at $1,311,008. Minus the depreciated value of site improvements, and plus the as-is value of site improvements, Mr. Hoover estimated the value of the lot plus the house at $2,421,678 using the cost approach.

We conclude that the evidence preponderates in favor of the appraisal value of $2,421,678 offered by Ms. Clement's appraiser, Ray Hoover, based on the cost approach. There were significant weaknesses in Mr. Tyson's appraisal that cast doubt upon the validity of his appraisal. On his appraisal report, Mr. Tyson erroneously indicated that the lot consisted of 3.38 acres. The lot actually consisted of 4.2 acres. Whether the entirety of the 4.2 acres should have been considered in the appraisal was contested at trial, since a small cemetery was included on the property, and the Clements were not taxed on the property where the cemetery sits. But even considering the presence of the cemetery, it was agreed by all parties that the lot was *at least* 3.83 acres in size, and that the

cemetery did not detract from the "curb appeal" of the property, and, indeed, had only been visited twice during the time the Clements lived there. Mr. Tyson inexplicably based his appraisal on a 3.38-acre lot. Furthermore, we note that the comparable properties used by Mr. Tyson were quite different from the Clement property. Of the six comparable properties used by Mr. Tyson in making his estimate, only one of them sat on more than one acre of property, and most of the comparable houses were of significantly less square footage than the 9,757 square foot Clement home---only three of the comparable properties used by Tyson had more than 7,000 square feet, none had more than 7,906 square feet, and the other three ranged from 5,630 to 6,536 square feet. Although Mr. Tyson adjusted the sales price of these comparable properties accordingly, we believe that, when combined with his erroneous calculation of the size of the Clement lot, these disparities between the comparable properties and the Clement property renders the validity of his appraisal questionable.

By contrast, Ms. Clement's appraiser, Ray Hoover, offered an estimate based on the 4.2 acre size of the lot, which, unlike Mr. Tyson's 3.38-acre figure, was at least arguably the correct size of the lot. Of the six comparable properties used by Ms. Clement's appraiser, four of them were of homes that sat on greater than one acre. The acreage of the comparable properties used by Mr. Hoover was as follows: 0.43 acres, 0.46 acres, 1.75 acres, 2 acres, 2.95 acres, and 7 acres. The square footage of the comparable homes used by Mr. Hoover was also more in line with the size of the Clement home, with square footages ranging from 5,500 square feet to 14,495 square feet, with only two of the comparable properties having less than 7,000 square feet.

We conclude that, given that Mr. Tyson based his appraisal on the inaccurate statement of the Clements' lot as being 3.38 acres, combined with the use of comparable properties that had significant disparities from the Clement property, the trial court erred in following Mr. Tyson's appraisal. We believe the evidence preponderates in favor of Mr. Hoover's appraisal of the property at the value of $2,421,678.

### (c) Distribution of the marital residence

We conclude that the equity in the marital residence should be distributed equally between the parties. The case will be remanded to the trial court to consider a method of payment, such as installment payments or the sale of the house and division of the proceeds.

**3. "Did the Trial Court err in (A) failing to make a finding as to whether the appreciation in Mr. Clement's separate property was marital or separate; and (B) failing to find that the appreciation of Mr. Clement's separate property should be included in the parties' marital estate and equitably distributed with the parties' other marital assets?"**

Ms. Clement's third issue on appeal is whether the trial court erred in failing to find that appreciation in the value of Mr. Clement's separate property was marital property, and in failing to distribute such property with the other marital assets. Through family gifts and inheritance, Mr. Clement has received numerous assets that he contends are his separate property. These assets include 7,754.5 shares of Guaranty Loan and Real Estate in West Memphis, Arkansas, which

constitutes a 7.3% interest in that company[2]; seven shares of Avondale Apartments, Inc. (out of thirty outstanding shares, eight of which are owned jointly by Mr. and Ms. Clement); a fifty percent interest in Clement & Norfleet, a commercial real estate concern in West Memphis; an interest in Clement & Norfleet Farms, the operating arm for Parkin Farm in Cross County, Arkansas; and an interest in Parkin Farm consisting of a 438 acre tract owned by Mr. Clement and a 4,100 acre tract owned jointly by Mr. Clement and his cousin, Jay Norfleet (who owns another 530 acre tract). The proof at trial showed that each of these properties had appreciated significantly during the twenty-two year duration of the Clement marriage. While Ms. Clement concedes that these properties began as Mr. Clement's separate property, she contends that, due to her contributions to their marriage as a homemaker, she contributed to the appreciation and preservation of these assets, and that therefore such appreciation should be considered part of the marital estate and distributed accordingly.

### *(a) Ms. Clement's contributions as a homemaker to the preservation and appreciation of Mr. Clement's separate property.*

Under Tennessee law, inherited property is generally separate property that is not subject to division as marital property upon divorce. *See* Tenn. Code Ann. § 36-4-121(b)(2). However, the income from and increase in value of separate property may be considered marital property if each party substantially contributed to the separate property's preservation or appreciation. A "substantial contribution" is one that is real and significant. It need not be monetarily commensurate with the appreciation in a property's value during the marriage. Moreover, the contribution need not be directly related to the specific property involved. A contribution is substantial if it enabled the spouse who owns the property to retain it during the marriage. For this reason, Tenn. Code Ann. § 36-4-121(b)(1)(D) provides that a substantial contribution can include "the direct or indirect contribution of a spouse as homemaker, wage earner, parent, or family financial manager, together with such other factors as the court having jurisdiction thereof may determine."

As we have noted elsewhere in this opinion, the trial court made no fact-finding concerning the contributions of Ms. Clement to the appreciation or preservation of the separate properties of Mr. Clement. In the absence of such fact-finding, we review the record *de novo*. It is apparent from the record that Ms. Clement was primarily responsible for the homemaking responsibilities in the Clement household. She devoted herself to the responsibilities of a homemaker with Mr. Clement's blessing; indeed, it is conceded by both parties that Mr. Clement did not want her to be employed outside of the home. By taking care of these duties, Ms. Clement enabled Mr. Clement to spend much of his time outside the home pursuing business interests, community involvement, and recreational activities. Mr. Clement claimed, at trial, that he had done nothing to contribute to the appreciation of his separate properties during the duration of his marriage to Ms. Clement. He pointed out that the actual day-to-day management of his properties was delegated to other individuals. The upshot of these assertions is that, if Mr. Clement did nothing to contribute to the

---

[2] Mr. Clement's 7,754.5 shares in Guaranty include 6,327.5 shares he owns outright (5.93% of the company's outstanding stock), and 1,427 shares that are held in trust for Mr. Clement's benefit (1.34% of the company's outstanding stock).

appreciation or preservation of these separate properties, then Ms. Clement cannot be credited with helping to make such appreciation or preservation possible through her contributions as a homemaker. It strains credulity for Mr. Clement to suggest that he had little or no role in the preservation or appreciation of his separate assets during his marriage to Ms. Clement. While it may be true that many of the day-to-day responsibilities of managing the properties were delegated to other individuals, the record shows that Ms. Clement's contributions as a homemaker freed Mr. Clement up to oversee his wide range of properties and investments unburdened by the day-to-day management of the home or many of the responsibilities involved in parenting their son Bowers.[3] Mr. Clement himself acknowledged that much of the management of his separate properties was delegated to employees of Guaranty Loan, of which Mr. Clement was an owner. Furthermore, even while such employees may have done the bulk of the work, Mr. Clement did, at times, take an active role in managing the properties---for example, he rehabilitated about 160 apartment units owned by Guaranty; he participated in the firing of a farm manager of Parkin Farm; and he was consulted by Guaranty's employee Randy Catt whenever the farmers who leased Parkin Farm desired to make improvements to the property. Whether he chose to manage his properties by delegating day-to-day responsibility to other individuals is not especially material to this analysis. What is important is that Mr. Clement was ultimately responsible for managing his own properties and Ms. Clement's work as a homemaker allowed him to do just that. Given the length of the marriage, Ms. Clement's substantial responsibilities as a homemaker, and the fact that several of these properties maintained their value, or appreciated in value, under the management of Mr. Clement or his agents, we conclude that the appreciation of several of Mr. Clement's separate properties during his marriage to Ms. Clement should be considered marital property. We will proceed to analyze each of the separate properties at issue in this case to determine whether their appreciation should be deemed separate property.

### (b) Classification and valuation of Mr. Clement's separate properties

The trial court heard a great deal of testimony about the nature of Mr. Clement's management of his separate properties as well as their value. Mr. Clement gave testimony as to the value of his properties, and Ms. Clement introduced expert testimony on the value of Guaranty Loan and Parkin Farm. We will address each of the properties in turn.

### (i)     Guaranty Loan and Real Estate Company

---

[3] Mr. Clement's implicit argument (that because the day-to-day management of his properties was delegated to employees of the company of which he was part owner, none of the preservation or appreciation of the value of such properties can be attributed to his effort, and therefore cannot be considered marital property since Ms. Clement's contributions as a homemaker were of no consequence in the preservation or appreciation of such property's value) would have the effect that, the broader an individual's separate property holdings, the less the appreciation of such properties could be considered part of the marital estate, since a larger estate would naturally necessitate greater delegation of hands-on management to others. We do not believe the law of Tennessee countenances such a result. Even when an individual, such as Mr. Clement, manages such property largely by delegation of responsibility to others, we conclude that the preservation and appreciation of the value of such property is properly attributable to his or her effort and therefore, to the homemaking spouse's efforts as well.

At the time of trial, Mr. Clement owned a 7.3 percent share in Guaranty Loan and Real Estate Company. On his 14(c) affidavit filed during the divorce proceedings, Mr. Clement stated that the value of his stake in Guaranty Loan was $510,570 when he acquired it, and that it had a fair market value of $715,000.00 at the time of the affidavit. Ms. Clement, in her 14(c) affidavit, stated that Mr. Clement's stake in Guaranty Loan was $640,909 when he acquired it, and that it was worth $1,118,893 at the time of the affidavit.

Ms. Clement retained Alec Ivy, a certified public accountant, to measure the value of Mr. Clement's stock in Guaranty.[4] It appears that Mr. Clement based his $715,000 estimate of the company's value on the work of a certified public accountant named Osborn. Since Mr. Osborn was not called to testify at trial and no report prepared by him was entered into evidence, the record contains scant indication of how the current market value of $715,000 offered by Mr. Clement was derived, aside from Mr. Osborn's general description of his methodology.[5] Mr. Ivy suggests that Mr. Clement's value was based on the historical accounting at cost. Mr. Ivy was called by Ms. Clement to testify to the value of Guaranty, by making adjustments to the book value upon which Mr. Clement's valuation of Guaranty was based. Mr. Ivy testified that a more accurate measure of the worth of Mr. Clement's shares in Guaranty would be derived from the Crittenden County tax assessor values of some of the real property held by Guaranty. However, he did not make this adjustment to agricultural property held by Guaranty, since, according to Mr. Ivy, farm property in Crittenden County has an "artificially low tax assessed value." Using his methodology, Mr. Ivy stated the value of Mr. Clement's shares held outright in Guaranty to be $1,118,893 after tax reserves.

Because Mr. Clement did not introduce any documentary or testimonial evidence as to how he arrived at measurement of the value of his Guaranty stock, while Ms. Clement introduced an expert report and testimony by Mr. Ivy---evidence that appears to be highly credible upon our review of the record---we conclude that the evidence preponderates in favor of the measurement of value

[4] At trial, Mr. Clement's counsel objected to the admission of Mr. Ivy's testimony on grounds of relevance, since Mr. Ivy declined to describe his measurement of the value of Mr. Clement's shares in Guaranty as an "appraisal." Mr. Ivy explained that the term "appraisal" denotes a more far-reaching examination of a company's value than he carried out, one that would also involve an "investigation of the profits in comparable companies and so forth." Mr. Ivy's procedure was a more limited one, and therefore he was not comfortable calling it an "appraisal." Rather, he called his work a "measurement of value." Ms. Clement's counsel, Mr. Caywood, explained that Mr. Ivy's testimony was analogous to a cross-examination of Mr. Clement concerning his valuation of his stock in Guaranty. The trial court, we believe correctly, concluded that Mr. Ivy's refusal to call his opinion of the Guaranty stock's value an "appraisal" goes to the weight, not the admissibility, of the evidence.

[5] Ms. Clement's attorney read into the record part of the report prepared by Mr. Osborn. It read, in part: "Per your instructions, we have conducted a general review of the books and records of Duke B. Clement, Jr. and Janet Clement as of December 31, 2000 for the special purpose of identifying assets and liabilities ... as to marital or separate property as set out in Tennessee statute 36-4-121. Our review included an inspection of the books of accounts of Duke B. Clement, Jr., an inspection of tax returns, financial documents, estate tax records and gift tax returns of Mr. Clement's parents and grandparents .... You have asked that our report include the estimated fair market value of various assets. We have relied upon the opinion of Mr. Clement with respect to those assets not readily valued. Although we make no representation as to these valuations, nothing has come to our attention to suggest the values presented are unreasonable."

offered by Ms. Clement's expert, Mr. Ivy. Therefore, we conclude that the correct measurement of the stock's current value, for the purpose of determining its appreciation since its acquisition, is $1,118,893. The record does not indicate how the parties arrived at the values they contend the stock in Guaranty to have had at the time of its acquisition by Mr. Clement. Ms. Clement stated that it had the value of $640,909 at acquisition and Mr. Clement contended the value was $510,570. In the absence of any other evidence, we follow the value given in Mr. Clement's 14(c) affidavit of $510,570, since he was in the best position to know its value. As a result, we conclude that Clement's stake in Guaranty Loan appreciated by $608,323 during the Clement marriage, and that this must be distributed with the marital estate.

### (ii)    Avondale Apartments, Inc.

Mr. and Ms. Clement have an interest in Avondale Apartments in West Memphis, Arkansas. Mr. and Ms. Clement jointly own eight shares, and Mr. Clement holds seven shares as separate property. Mr. Clement testified that Bill Catt, an employee, manages the Avondale Apartments and that neither Mr. nor Ms. Clement had any involvement in the day-to-day management of this property. At trial it was undisputed that Mr. Clement's separate ownership interest in the Avondale Apartments appreciated by $92,820 during the Clements' marriage. Ms. Clement contends that the appreciation in value constitutes marital property, and further suggests in her appeal brief (apparently on a theory of transmutation) that since proceeds from the shares she owns jointly with Mr. Clement are used to pay Mr. Catt, the appreciation of Mr. Clement's seven separate shares constitutes marital property. As we have explained *supra*, we are not persuaded by Mr. Clement's argument that since an employee is delegated the responsibility for managing his property, Mr. Clement has no role in the preservation or appreciation of its value. We believe that Avondale Apartments is another property that must be deemed to have been under the management of Mr. Clement---even if he delegated day-to-day management to an employee of his family business---and that this arrangement was made possible, at least in part, by Ms. Clement's complete assumption of the responsibilities of homemaker. Therefore, we conclude that the appreciation in the value of the Avondale Apartments is properly considered to be part of the marital estate.

### (iii)    Clement & Norfleet

Mr. Clement owns a fifty percent interest in Clement & Norfleet, a commercial real estate concern in West Memphis, Arkansas. Mr. Clement testified at trial that he received this stake in Clement & Norfleet as a gift from his father in the early 1980s. The property is managed by a Guaranty employee, Bill Catt. Ms. Clement contends that, due to commingling of marital property with Mr. Clement's interest in Clement & Norfleet, the cash reserves of Clement & Norfleet are marital property and should be distributed accordingly.

We agree with Ms. Clement that the appreciation of Clement & Norfleet is correctly considered marital property, since this asset, like Guaranty and Avondale Apartments, was managed by Mr. Clement's employees and a preponderance of evidence shows that its value did not appreciate solely due to market forces. The properties held by Clement & Norfleet are commercial properties that would require repair, maintenance, and other forms of general managerial oversight to retain

their value. Because this property was managed by Mr. Clement and his agents, we believe its appreciation can be attributed in part to Ms. Clement's contributions as a homemaker.

As to the value of Mr. Clement's interest in Clement & Norfleet, there is little evidence in the record concerning the value of this asset. Mr. Clement does not address the existence of cash reserves, but states that his interest in Clement & Norfleet had a value of $261,550 when he acquired it, and had an appreciated value of $282,000. We found no testimony in the record discussing the existence of a cash reserve, and aside from Ms. Clement's 14(c) affidavit, no other indication that such a reserve existed. We will follow Mr. Clement's 14(c) statement of the value of his interest in Clement & Norfleet, and we conclude that the appreciation of Clement & Norfleet, in the amount of $20,450 should be considered part of the marital estate.

### (iv) *Parkin Farm*

Mr. Clement and a partner, Jay Norfleet, own three tracts of land in Parkin, Arkansas, known collectively as Parkin Farm. Mr. Clement received his interest in Parkin Farm in 1991 and 1992 as a gift from his mother. Mr. Clement's and Mr. Norfleet's respective interests in Parkin Farm are divided as follows: Mr. Clement owns one 438-acre tract (the "Parkin Tract"[6]), Mr. Norfleet owns one 530-acre tract (the "Section 17 tract"); and both parties own the remaining 4100-acre tract (the "Large Tract") as tenants in common. Mr. Clement contended at trial that his interest in Parkin Farm was worth $1,061,400 at acquisition, and $1,441,000 at the time of trial, giving an appreciation of $379,600. He did not introduce an expert report or expert testimony to support these valuations. Ms. Clement contended that Mr. Clement's interest in Parkin Farm was worth $1,139,422.60 at acquisition, and $2,630,409.60 at trial. Ms. Clement introduced Mr. James Wood, a staff appraiser for Farm Credit MidSouth, in Wynne, Arkansas, to testify concerning the fair market value of the farm at the time of trial. Based on Mr. Wood's appraisal, Ms. Clement alleges that Mr. Clement's interest in the farmland appreciated by $1,490,897 during the marriage, and that such appreciation is marital property that should be distributed accordingly.

The testimony at trial, concerning the use and management of Parkin Farm, was as follows. Mr. Clement testified that the farm is used to farm agricultural crops. He testified that he had no responsibility for the day-to-day management of the farm or dealing with the farmers, but that Randy Catt, an employee of Guaranty, handled many of the management tasks. Farm managers oversaw the farm, and Mr. Clement had been involved in firing one of the farm managers. Mr. Clement testified that he never went to inspect the farm. He received a percentage of the revenue from the crops farmed there. Two farmers leased the farm, under leases negotiated by Randy Catt on Mr. Clement's and Mr. Norfleet's behalf. Mr. Catt did not receive any "parameters" from Mr. Clement and Mr. Norfleet before negotiating the leases, but Mr. Clement and Mr. Norfleet "both let him go

---

[6] For ease of reference, we adopt the terms used by Ms. Clement's expert appraiser, James A. Wood, to refer to the tracts that make up Parkin Farm: "Parkin Tract" refers to the 438-acre tract owned by Mr. Clement; "Section 17 Tract" refers to the 530-acre tract owned by Mr. Norfleet; and "Large Tract" refers to the 4100-acre tract owned by Mr. Norfleet and Mr. Clement as tenants in common.

out and do it." At the time of trial, the farm was being leased to the farmers under a deal that had been worked out several years earlier. Mr. Clement testified that whenever the farmers who lease the land desire improvements to the farm, the farmers will approach Randy Catt concerning the proposed improvements, and that "Randy will come and talk with us [Mr. Clement and Mr. Norfleet], and then he'll go back and work it out with the farmers." Certain improvements, paid for by Mr. Clement and Mr. Norfleet, had been made to the farm.

The value of the improvements made to Parkin Farm is a critical consideration in resolving the question of how the appreciation in value of Mr. Clement's interest in Parkin Farm should be classified. If the value of these improvements is negligible, we may conclude that the value of Parkin Farm rests primarily in its cropland and that any increase in the value of Parkin Farm in the years since its acquisition was due to inflation and market forces. Conversely, if the value of these improvements is considerable, it stands to reason that the maintenance or appreciation of the value of Parkin Farm is due, at least in part, to the installation and maintenance of these improvements and the management of the farm by Mr. Clement and his co-tenant, Mr. Norfleet, or their agents. There was no testimony taken at trial concerning the nature of improvements made to the farm, but the appraisal report prepared by Ms. Clement's expert, James A. Wood, a Senior Staff Appraiser with Farm Credit Midsouth, ACA, is illuminating on this point. According to Mr. Wood's report, the improvements on Parkin Farm include a shop/equipment shed located on the Large Tract; a 1.2 mile center pivot located on the Large Tract; a 1/4 mile center pivot located on the Section 17 tract; a number of irrigation wells located at various places across the three tracts; twelve grain bins in poor condition, located on the Parkin Tract; an old quonset-style building in poor condition, with some limited utility for storage, located on the Parkin Tract; a wood-frame, tin-clad shed in poor condition that possesses limited utility for storage, located on the Parkin Tract; and an old barn located on or near the property boundary of the Parkin Tract. According to Mr. Wood, the total value of the improvements to Parkin Farm was approximately $102,024, and he stated that the grain bins, quonset-style building, shed, and old barn contributed nothing to the value of the tracts. There was no evidence introduced concerning what specific improvements to the farm had been made by Mr. Clement and Mr. Norfleet, and what improvements were present on the land when it was acquired. The vast majority of the value of Parkin Farm was the value of its cropland. Mr. Wood appraised the value of the farm at $5,300,000, with Mr. Clement's stake valued at $2,630,409.60. Mr. Clement valued his stake in Parkin Farm at $1,441,000.

Because the value of the improvements to Parkin Farm is clearly a negligible component of the property's overall value—indeed, there are *no* valuable improvements on the Parkin Tract owned separately by Mr. Clement—and because there was little or no evidence introduced at trial to suggest that any valuable improvements were made by Mr. Clement and Mr. Norfleet after they acquired the land, we conclude that the appreciation in value of the farm since it was acquired is not traceable to the management of the farm by Mr. Clement, Mr. Norfleet, or their agents, but rather is a passive increase in value due to inflation. In *Harrison v. Harrison*, **912 S.W.2d 124 (1996)**, the Tennessee Supreme Court considered whether an increase in value of farmland that a husband acquired as separate property should be considered marital property. At trial in *Harrison*, it was acknowledged by both parties that the sole cause of increase in the value of farmland was due to the construction

of Interstate 24 across the property. Therefore, the appreciation was deemed not to be attributable to the efforts of one or both of the spouses, and the Supreme Court held that the appreciation could not be considered marital property. We consider the case at bar to be analogous to ***Harrison***, in that the record shows no substantial contribution by either Mr. Clement or Ms. Clement to the appreciation in value of the property, but rather, it appears that the appreciation in value was due solely to market forces and inflation.

We conclude that, in view of the relatively minimal improvements present on the farm and the fact that the great majority of the farm's value lies in its cropland, the appreciation constitutes a passive increase in value that cannot be attributed, in any part, to Ms. Clement's contributions as a homemaker. Therefore, the appreciation in the value of Parkin Farm cannot be deemed marital property.

### (v) *Clement & Norfleet Farms*

Clement & Norfleet Farms is the operating arm of Parkin Farm. As the Parkin Farm generates revenue, the revenue is deposited into the bank account of Clement & Norfleet Farms. Mr. Clement testified at trial that Clement & Norfleet Farms does not have any assets except the bank account. On his 14(c) affidavit, Mr. Clement indicated that the appreciation of his share of Clement & Norfleet Farms was $44,000. Ms. Clement indicated that Clement & Norfleet Farms possessed an undistributed cash reserve, of which Mr. Clement's share was $139,465.

We conclude that the value of Mr. Clement's interest in Clement & Norfleet Farms must be considered marital property. By virtue of the control exercised by Mr. Clement or his agents over his interest in Parkin Farm, Mr. Clement has actively managed his stake in Parkin Farm since he acquired it. Therefore, we hold that Ms. Clement through her efforts as a homemaker made a substantial, indirect contribution to the acquisition of the revenue from Parkin Farm. The only evidence in the record concerning the value of Clement & Norfleet Farms are the figures contained in the respective 14(c) affidavits of Mr. Clement ($44,000) and Ms. Clement ($139,465). In the absence of any other evidence, we follow Mr. Clement's value, as he, being the owner of this asset, is in a better position to know its actual value. Therefore, this $44,000 interest must be included in the marital estate and distributed accordingly.

### (vi) *Hunting Club Memberships*

Mr. Clement belongs to two hunting clubs, the Five Lakes Outing Club (a hunting and fishing club near Hughes, Arkansas), and the Greasy Slough Hunting Club (a duck hunting club near Jonesboro, Arkansas). The memberships began as Mr. Clement's separate property; he received his membership to Five Lakes Outing Club from his grandfather's estate and received his membership to Greasy Slough Hunting Club at the age of sixteen as a gift from his grandfather. It is undisputed that the value of the club memberships appreciated by $229,000 during the Clement marriage, Five Lakes by $130,000.00 and Greasy Slough by $99,000.00. Mr. Clement testified that he paid annual dues and assessments to each club from the Clements' joint checking account. Over the five years

leading up to trial, Mr. Clement testified that he paid, on average, $1,300 per year to Greasy Slough, and $4,300 per year to Five Lakes Outing Club. He once made a payment of $2,777.78 from the joint checking account to retire another member's membership in Greasy Slough. Ms. Clement contends this appreciation constitutes marital property, and that she should be awarded half of that amount.

There is no evidence that Mr. Clement did anything to preserve or enhance the value of these memberships aside from paying his dues and assessments and retiring a single membership in Greasy Slough. Although it is true that these payments were made from the joint checking account, we note that these payments—over the five years leading up to trial—totalled approximately $22,000 with respect to Five Lakes Outing Club and approximately $6,500 with respect to Greasy Slough. These payments are dwarfed by the great appreciation in the value of these memberships. We cannot conclude that Ms. Clement made a substantial contribution to the preservation or appreciation in value of these memberships. We hold that the appreciation in value of the hunting club memberships cannot be considered marital property.

### (c) The distribution of appreciation in Mr. Clement's separate properties

Having considered the Tennessee statute governing the division of marital property, T.C.A. § 36-4-121, and applicable case law, we have concluded that it is necessary to amend the trial court's distribution of marital property in the following way, to account for the appreciation of several of Mr. Clement's separate properties as described in this section, *supra*. As to the appreciation in Guaranty, Avondale Apartments, Clement & Norfleet, and Clement & Norfleet Farms, we conclude it is appropriate to award Ms. Clement 30% of the appreciated value of each of these properties, and Mr. Clement 70% of the appreciated value. In so concluding, we are guided, in part, by the reasoning of another panel of this court in the case of ***Brown v. Brown*, 913 S.W.2d 163 (Tenn. 1995)**. In ***Brown***, an appeal from a divorce decree, the husband had inherited an interest in a concrete business. After he assumed control of the family business, the parties' income increased substantially. When the earnings of the wife, a schoolteacher, and husband were combined, they were able, in the words of this Court, to live an "opulent lifestyle." On appeal, one of the issues was whether the wife's contributions as a homemaker, together with her financial contributions from her own job, supported a finding that she had made a substantial contribution to the preservation and appreciation of her husband's interest in the concrete business. The court found that she had, in fact, made such a substantial contribution. However, since she was never directly involved with any aspect of the business, this Court found that her indirect contributions entitled her to a 20% share of the appreciation in her husband's concrete business. We conclude that, while this case bears some similarities to the situation in ***Brown***, the equities favor awarding Ms. Clement a larger percentage of the appreciation in her husband's separate assets with respect to which we have determined that the appreciation is marital property. Among other considerations, we note that while in ***Brown***, the homemaking spouse had maintained a career of her own as a tenured schoolteacher—and thus incurred less financial detriment by her homemaking—Ms. Clement was a full-time homemaker for thirteen years and the proof at trial clearly established her financial detriment as a result of her years outside the paid workforce. In our view, 30% is an equitable share of the appreciation in view of the equities here.

**4. "Did the Trial Court err in failing to distribute various valuable marital assets and substantial liabilities resulting in an inequitable distribution of marital property?"**

Ms. Clement's next issue on appeal is whether the trial court erred in failing to distribute various marital assets and liabilities, with the result that the court's distribution of marital property was inequitable. The assets in question include the substantial personal property in the possession of Ms. Clement and Mr. Clement, as well as a valuable wine collection the value of which she estimated to be $66,700. The liabilities include two promissory notes to Alvin Traylor, Jr. (Ms. Clement's father), into which she entered during the parties' separation, for the purpose of purchasing a separate residence.

*(a) Failure to distribute marital assets*

Ms. Clement alleges that the trial court failed to include, in the distribution of marital property, $175,340 of personal property in the possession of Mr. Clement, as well as $38,722 in personal property in her possession. Furthermore, the trial court allegedly failed to distribute a wine collection the value of which she estimated to be $66,700.

Under Tennessee law, marital property includes all personal property held by the spouses in a divorce proceeding, as long as such property was acquired during the marriage. T.C.A. § 36-4-121(b)(1)(A) reads, in relevant part,

> "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date.

In her 14(c) affidavit, Ms. Clement includes an exhaustive list of personal property held by herself and Mr. Clement.[7] In her 14(c) affidavit, Ms. Clement asserts that the personal property in her possession is worth $38,722, and asserts that the personal property in the possession of Mr. Clement is worth $175,340. She further states that a wine collection in Mr. Clement's possession, purchased during the marriage and not included in the list of other personal property, is worth $66,700. In his 14(c) affidavit, Mr. Clement does not mention or value any personal property, nor does he mention or value the wine collection.

---

[7] This list includes furniture, accessories, appliances, artwork (including a $50,000 Carroll Cloar painting), electronics, rugs, lamps, crystal, exercise equipment, garden items, linens, animal trophies, memorabilia, yard equipment, tools, guns, curtains, and family albums.

It was brought out at trial that at her deposition in the divorce proceeding, Ms. Clement had stated that she had "no idea" what the fair market value of tangible personal property in the marital residence would be, or what percentage was a gift from Mr. Clement's family or was purchased during the marriage. However, she testified that after her deposition, she attempted to determine the value of the personal property in question and its provenance. She also priced the wine collection at a Memphis liquor store. Mr. Clement offered no alternative valuations of the items she listed. After reviewing the list of personal property held by Ms. Clement, we conclude that the prices she attaches to the various items are reasonable, and that Ms. Clement's valuation of the property is the only competent evidence introduced at trial of the value of the personal property held by the parties.

A trial court has broad discretion in distributing marital property. However, the trial court in the case at bar did not mention the personal property at issue here, nor was there any indication that the value of such property was considered when the court distributed the marital property between the parties. Given the substantial value of the personal property at issue, we conclude that the failure to include this personal property in the valuation of the marital estate and in the distribution of marital property, was in error.

### (b) Failure to distribute marital liabilities

Ms. Clement further alleges that the trial court erred in failing to distribute marital liabilities in the form of two promissory notes, totaling $60,000, into which she entered prior to the final decree of divorce[8], for the purpose of purchasing a home for herself and Bowers at 959 E. Riverwalk Drive in Memphis. Mr. Clement argues, in his appeal brief, that the debt was not a marital debt since it was incurred during the separation of the parties. Ms. Clement asserts that, since the debts were incurred during the marriage of the parties, they are marital debts.

Under Tennessee law, any debt incurred during a marriage—including one incurred during a separation—is a marital debt. In *Alford v. Alford*, **120 S.W.3d 810, 813 (2003)**, the Tennessee Supreme Court stated:

> We ... hold that "marital debts" are all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing.... Unless a court has made provisions for the distribution of property in a decree of legal separation, a period of separation before divorce has no effect on the classification of debt as marital or separate.

Under *Alford,* then, it is clear that the promissory notes entered into by Ms. Clement constitute

---

8 The promissory note for $10,000 was entered into on July 13, 2001. The promissory note for $50,000 was entered into on March 7, 2002. The final decree of divorce was entered on September 2, 2003.

marital debts, and must be distributed with the marital estate.[9]

It remains for us to determine *how* this marital debt must be allocated between the parties. On this point, *Alford v. Alford* does permit the consideration of the *Mondelli* factors that were rejected in determining whether a debt was separate or marital. The *Alford* court stated:

> [W]e next consider how the debts should be allocated between Husband and Wife. Tennessee courts should use the four factors listed in *Mondelli* as guidelines in the equitable distribution of marital debt: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt. A careful application of these factors will insure the fairest possible allocation of debt. It will also protect the spouse who did not incur the debt from bearing personal responsibility for debts that are the result of personal excesses of the other spouse.

*Id*. at 814 (internal citations omitted). Having considered these factors, we conclude that the debt, represented by the promissory notes totaling $60,000, should be allocated two-thirds to Ms. Clement, and one-third to Mr. Clement. While this debt was incurred by Ms. Clement primarily for her own benefit, it was also incurred for the benefit of their son Bowers, of whom Ms. Clement was the primary residential parent. Mr. Clement, clearly, is better able to repay the debt than is Ms. Clement. Bowers was almost sixteen years old when the final decree of divorce was entered, and therefore was likely to live in the house for two or more years following the divorce decree. Furthermore, in light of the Supreme Court's concern with protecting a spouse from the "excesses" of the other spouse, we cannot say that Ms. Clement's purchase of the Riverwalk Drive house, for the amount of $451,000, was excessive in view of the lifestyle in which she and Mr. Clement had lived during their marriage, and considering that their River Tide Cove house was appraised at $2,421,678. We conclude, therefore, that dividing the debt so that $40,000 is allocated to Ms. Clement, and $20,000 is allocated to Mr. Clement, is equitable.

**5. "Did the Trial Court err in valuing the automobile Ms. Clement primarily drove?"**

Ms. Clement's next issue on appeal concerns the valuation of the automobile driven primarily by her. The automobile, a 1989 BMW 540i, was valued in the National Automobile Dealer's Association (NADA) Used Car Guide ("the Blue Book") at $21,050. In his appeal brief, Mr. Clement contends that Ms. Clement "offered absolutely no proof, through her testimony or through an expert witness, as to the value of that vehicle." We respectfully disagree with Mr. Clement. Ms.

---

[9] Mr. Clement, in his appeal brief, misstates the application of *Alford*. Mr. Clement states, "In *Alford v. Alford* ... the Court held that 'marital debts' are those incurred during the marriage for the 'joint benefit of the parties.'" This is a patent misreading of *Alford*. In fact, *Alford* explicitly rejects the "joint benefit" test, enunciated in *Mondelli v. Howard*, **780 S.W.2d 769** (Tenn. Ct. App. 1980), for determining whether a debt is separate or marital: "After carefully considering the matter, we reject the *Mondelli* analysis to the extent that it requires a trial court to engage in a preliminary determination of whether debt incurred during a marriage is marital or separate based on a 'joint benefit' test." *Alford*, **120 S.W.3d at 813.**

Clement states in her 14(c) affidavit that the value she offers for the BMW is a current NADA value as of January 2003. Since the affidavit is required by the local rules of court, was properly attested to by Ms. Clement, and was properly introduced at trial, the affidavit is competent evidence of the value of the car according to NADA. Mr. Clement, however, offered no basis for attaching the value of $36,000 to the BMW. In **Terrell v. Terrell, No. 02A01-9610-CV-00254, 1997 WL 576536 (Tenn. Ct. App. Sep. 18, 1997)**, we stated that while "Blue Book" valuations are not conclusive evidence of an automobile's value, they constitute "highly probative evidence." Since the blue book value was the only "highly probative evidence" of this automobile's value introduced at trial, we conclude that the trial court erred in basing its valuation of Ms. Clement's automobile at $36,000.

**6. "Should Ms. Clement be awarded alimony in solido from Mr. Clement's separate estate (which Mr. Clement values in excess of $5.3 Million) where the parties were married for 22 years; where Ms. Clement fulfilled her role in every respect as a wage-earner, home-maker, and parent; where Mr. Clement earned approximately $645,400 per year; and where Mr. Clement has an enormous separate estate (Ms. Clement only raises this issue as an alternative argument in the event this Court finds, after reviewing the entire record, that the parties' actual marital estate is insufficient to arrive at a just result)?"**

We have concluded that the marital estate is sufficient to arrive at a just result in this case; therefore, we pretermit this issue.

**7. Did the Trial Court err in awarding Mrs. Clement rehabilitative alimony in the amount of $4000.00 per month for seven years?**

Mr. Clement's sole issue on appeal is whether the trial court erred in awarding Ms. Clement rehabilitative alimony in the amount of $4000 per month for seven years. We review matters of alimony under an abuse of discretion standard. If the discretionary decision is within a range of acceptable alternatives, appellate courts will not substitute their decision for that of the trial court simply because the appellate court would have chosen a different alternative. We review the trial court's discretionary decisions to determine: (1) whether the decisions are supported by the facts in evidence; (2) whether the trial court identified and applied the applicable legal principles; (3) whether the trial court's decisions are within the range of acceptable alternatives. **Sullivan v. Sullivan, 107 S.W.3d. 507, 510 (Tenn. Ct. App. 2002).** We will first review the applicable legal principles.

The award of rehabilitative alimony is governed by T.C.A. § 36-5-101(d)(1)(A)-(E), which reads, in relevant part, as follows:

(A) Spouses have traditionally strengthened the family unit through private arrangements whereby one (1) spouse focuses on nurturing the personal side of the marriage, including the care and nurturing of the children, while the other spouse focuses primarily on building the economic strength of the family unit. This arrangement often results in economic detriment to the

spouse who subordinated such spouse's own personal career for the benefit of the marriage. It is the public policy of this state to encourage and support marriage, and to encourage family arrangements that provide for the rearing of healthy and productive children who will become healthy and productive citizens of our state.

(B)    The general assembly finds that the contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage. Further, where one (1) spouse suffers economic detriment for the benefit of the marriage, the general assembly finds that the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

(C)    It is the intent of the general assembly that a spouse who is economically disadvantaged relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties. Where there is relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection (d), the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). An award of periodic alimony may be made either in addition to a rehabilitation award, where a spouse may be partially rehabilitated as defined in this subdivision (d)(1)(C), or instead of a rehabilitation award, where rehabilitation is not feasible. When appropriate, the court may also award transitional alimony ....

(E)    In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

> (i) The relative earning capacity, obligations, needs, and financial resources of each party including income from pension, profit sharing or retirement plans and

all other sources;

(ii) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(iii) The duration of the marriage;

(iv) The age and mental condition of each party;

(v) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(vi) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(vii) The separate assets of each party, both real and personal, tangible and intangible;

(viii) The provisions made with regard to the marital property as defined in § 36-4-121;

(ix) The standard of living of the parties established during the marriage;

(x) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(xi) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(xii) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

We will now proceed to consider the application of these guidelines to the facts of this case.

We note that, in keeping with the public policy concerns described in T.C.A. § 36-5-101(d)(1)(A), Ms. Clement did in fact devote herself wholly to the personal side of the Clement marriage, including the care and nurturing of their son, Bowers, to her own economic detriment. In fact, given Bowers' health problems in his early years and the learning disability diagnosed during his school years, the demands on Ms. Clement appear, to this Court, to have been greater than typical, all other things being equal. The record, as discussed in this opinion *supra*, shows that Ms.

Clement must be deemed "economically disadvantaged."

T.C.A. § 36-5-101(d)(1)(B) further instructs that the standard of living of an economically disadvantaged spouse should be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be enjoyed by the other spouse, "considering the relevant statutory factors and the equities between the parties." It is clear from the record that, while married, the Clements enjoyed an extremely comfortable lifestyle. Given his high income and substantial personal estate, one can reasonably expect Mr. Clement to continue a similar, extremely comfortable lifestyle post-divorce.

Ms. Clement was forty-four years old at the time of the divorce trial. She had spent thirteen years out of the workforce, and was earning approximately twenty thousand dollars per year at the time of trial. Although she earned a college degree, nothing in the record suggests that she possessed any special skills or proficiencies that would make her sought-after on the job market. Although it is true that Ms. Clement may have decades of useful employment ahead of her, it is unlikely that through reasonable effort she could achieve a lifestyle comparable to that which she and Mr. Clement enjoyed during marriage, or comparable to that which Mr. Clement can be expected to enjoy post-divorce. In light of these considerations, and having further considered the statutory factors set out in T.C.A. § 36-5-101(d)(1)(E), we conclude that the trial court did not abuse its discretion in making an award of rehabilitative alimony to her. We further conclude that the payment of this rehabilitative alimony should not end upon the death of Mr. Clement, in view of his large estate.

## VI. CONCLUSION

For all of the foregoing reasons, we hold that the trial court erred in its classification and distribution of marital property. We modify the trial court's final decree of divorce to distribute the property at issue in this appeal as follows:

| | Janet Clement | Duke Clement |
|---|---|---|
| *Properties at issue in this appeal, to be divided equally between the parties:* | | |
| River Tide Cove House | $927,839.00 | $927,839.00 |
| Personalty - Janet Clement | $38,722.00 | $0.00 |
| Personalty - Duke Clement | $0.00 | $175,340.00 |
| Wine Collection | $0.00 | $66,700.00 |
| BMW | $21,050.00.00 | $0.00 |
| Cash balancing payment | $182,268.00 | $0.00 |
| **SUBTOTAL** | $1,169,879.00 | $1,169,879.00 |
| | | |
| *Properties at issue in this appeal, to be allocated 30% to Ms. Clement and 70% to Mr. Clement:* | | |

| | | |
|---|---:|---:|
| Guaranty | $182,496.90 | $425,826.10 |
| Avondale Apartments | $27,846.00 | $64,974.00 |
| Clement & Norfleet | $6,135.00 | $14,315.00 |
| Clement & Norfleet Farms | $13,200.00 | $30,800.00 |
| **SUBTOTAL** | $229,677.90 | $535,915.10 |
| | | |
| *Marital liabilities at issue in this appeal, to be allocated 66.6% to Ms. Clement and 33.3% to Mr. Clement*: | | |
| Marital Liabilities | ($40,000.00) | ($20,000.00) |
| **SUBTOTAL** | ($40,000.00) | ($20,000.00) |
| | | |
| *Marital properties allocated by trial court, and undisturbed by this court:* | | |
| Fidelity National Bank Account | $5,800.00 | $0 |
| Phoenix Home Life Variable Annuity | $11,500.00 | $0 |
| Traveler's Life and Annuity IRA | $19,000.00 | $0 |
| New England Life Insurance Contract #8692382 | $4,220.00 | $0 |
| New England Life Insurance Contrac #8542315 | $5,782.00 | $0 |
| New England Life Insurance Contract #8157498 | $18,788.00 | $0 |
| New England Life Insurance Contract #28058185 | $900.00 | $0 |
| Marketable securities contained in Morgan Stanley Dean Witter account #372021949 | $57,000.00 | $0 |
| Fidelity Bank Account (Husband's) | $0 | $35,000.00 |
| National Bank of Commerce | $0 | $10,400.00 |
| Salomon Smith Barney | $0 | $13,600.00 |
| U.S. Allianz Annuity | $0 | $5,000.00 |
| Traveler's Life Annuity IRA | $0 | $37,000.00 |
| Guaranty Loan Defined Contribution Plan | $0 | $19,500.00 |
| Life Insurance Contract #8585814 | $0 | $28,850.00 |
| Life Insurance Contract #8766072 | $0 | $25,650.00 |

| | | |
|---|---:|---:|
| Memphis Country Club Membership | $0 | $3,000.00 |
| Memphis Hunt & Polo Club Membership | $0 | $2,000.00 |
| 1992 Chevrolet Blazer | $0 | $4,500.00 |
| 2000 GMC Yukon | $0 | $30,000.00 |
| 2001 Harley | $0 | $10,000.00 |
| Residence at 959 E. Riverwalk Drive | $51,000.00 | $0 |
| **SUBTOTAL** | $173,990.00 | $224,500.00 |
| | | |
| **TOTAL** | $1,533,546.90 | $1,910,294.00 |

We modify, as reflected in the above table, the trial court's order concerning the division of property, to give Ms. Clement and Mr. Clement equal interests in the equity in the River Tide Cove house in the amount of $927,839 each. In order to render equitable the allocation of the personal property held by the parties, the wine collection, and the BMW that was incorrectly valued by the trial court, the trial court's order is modified to award the amount of $182,268 to Ms. Clement. To compensate Ms. Clement for her interest in the appreciation of Mr. Clement's separate properties, the trial court's order is modified to award Ms. Clement the amount of $229,677.90. The trial court's order is modified to allocate to Ms. Clement $40,000 of the marital liability incurred to purchase her Riverwalk Drive home, and to allocate to Mr. Clement $20,000 of the same liability. In view of the fact that this division of property entails the expenditure of a large amount of cash by Mr. Clement, we remand this case to the trial court for the purpose of determining the proper method of achieving the equitable division of property provided for herein.

We further modify the trial court's order to provide that Mr. Clement's payment of rehabilitative alimony to Ms. Clement should not end upon the death of Mr. Clement, in view of his large estate. We leave undisturbed the provisions of the trial court's order awarding Ms. and Mr. Clement the various bank accounts, annuities, insurance contracts, and marketable securities (included in the chart of our distribution of property). Each party will be responsible for the mortgages on their respective houses. In all other respects, the trial court's order is left undisturbed. Costs in this appeal are taxed equally to the parties, Janet Clement and Duke Clement, and their respective sureties.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.